Amanda J.G. Walbrun, State Bar No. 317408
*walbrun@boucher.la*
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903
Tel:   (818) 340-5400
Fax:   (818) 340-5401

Annie McAdams, *pro hac vice pending*
*annie@mcadamspc.com*
ANNIE MCADAMS PC
2900 North Loop West, Suite 1130
Houston, Texas 77092
Tel:   (713) 785-6262

David E. Harris *pro hac vice pending*
*dharris@shhlaw.com*
819 N. Upper Broadway
Corpus Christi, Texas 78401
Tel: (361) 653-3300
Fax: (361) 653-3333

Attorneys for Plaintiff Jane Doe (C.M.G.)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE (C.M.G.) an individual, <br><br> *Plaintiff,* <br><br> v. <br><br> SIX CONTINENTS HOTELS, INC.;HOLIDAY HOSPITALITY FRANCHISING, LLC; PALMDALE RESORT, INC; BRIGHT HOLIDAY PALMDALE, LLC; TODAY'S V, INC.; 9901 LA CIENEGA (LOS ANGELES) OWNER, LLC and BRISAM LAX (DE) LLC, <br><br> *Defendants*. | Case No. <br><br><br> **PLAINTIFF'S COMPLAINT** <br><br><br><br> **DEMAND FOR JURY TRIAL** |

PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff Jane Doe (C.M.G.), Plaintiff in the above-styled and numbered cause, files this Complaint against SIX CONTINENTS HOTELS, INC.; HOLIDAY HOSPITALITY FRANCHISING, LLC; PALMDALE RESORT, INC; BRIGHT HOLIDAY PALMDALE, LLC; TODAY'S V, INC.; 9901 LA CIENEGA (LOS ANGELES) OWNER, LLC, and BRISAM LAX (DE) LLC as Defendants, and would respectfully show the Court and jury as follows:

## SUMMARY

1. Jane Doe (C.M.G.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3. Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

---

[1] 18 U.S.C. § 1591; 22 U.S.C. § 7102.

[2] 18 U.S.C. § 1591(e)(3).

5. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7. As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe (C.M.G.), with minimal risk of detection or interruption.

8. Defendants continued supporting traffickers, including Jane Doe (C.M.G.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotel and specifically at the hotel locations named herein. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

9. Plaintiff, Jane Doe (C.M.G.) is a resident of California. She may be contacted through her lead counsel, whose information is contained below.

10. Jane Doe (C.M.G.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

11. Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (C.M.G.).

12. Defendant Six Continents Hotels, Inc., is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: United Agent Group Inc., at 1521 Concord Pike, Suite 201, Wilmington, DE 19803, or wherever it may be found.

PLAINTIFF'S ORIGINAL COMPLAINT

13. Defendant Holiday Hospitality Franchising, LLC is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803, or wherever it may be found.

14. Defendants Six Continents Hotels, Inc., and Holiday Hospitality Franchising, LLC, will collectively be referred to as "IHG," "IHG Defendants," or "Franchisor Defendants." "The IHG Defendants were at all relevant times corporate affiliates under the IHG umbrella who were subject to common ownership, had highly integrated operations, shared employees, used common tools and resources, and shared information. All of the IHG Defendants participated in and benefited from the operation of IHG branded hotels, including the Subject Holiday Inn locations below. Upon information and belief, IHG owned, operated, controlled, and/or managed the following Franchisee locations:

a. TODAY'S V, INC d/b/a Holiday Inn located at 19800 S. Vermont, Torrance, CA 90502; and

b. PALMDALE RESORT, INC d/b/a Holiday Inn, located at 38630 5th Street, West Palmdale, CA 93551 from the beginning of Plaintiff's trafficking through November 2014;

c. BRIGHT HOLIDAY PALMDALE, LLC d/b/a Holiday Inn, located at 38630 5th Street, West Palmdale, CA 93551 starting in November 2014; and

d. 9901 LA CIENEGA (LOS ANGELES) OWNER, LLC d/b/a Holiday Inn, located at 9901 S. La Cienega Blvd, Los Angeles, CA 90045.

e. BRISAM LAX (DE) LLC d/b/a Holiday Inn, located at 9901 S. La Cienega Blvd, Los Angeles, CA90045.

15. Defendant TODAY'S V, INC., d/b/a Holiday Inn located at 19800 S. Vermont, Torrance, CA 90502 is a for corporation with its principal place of business in California. It may be served through its registered agent Louis N. Haas, 58 Maiden

PLAINTIFF'S ORIGINAL COMPLAINT

Lane, 2/F, San Francisco, CA 94108, or wherever they may be found. TODAY'S V, INC., will be referred to as " Torrance Franchisee" or "Franchisee Defendants.

16. Defendant PALMDALE RESORT, INC d/b/a Holiday Inn, located at 38630 5th Street, West Palmdale, CA 93551 is a for profit corporation with its principal place of business in California. It may be served through its registered agent Richard H Deihl at 2677 N. Main Street, suite 870, Santa Ana, CA 92705, or wherever it may be found. PALMDALE RESORT, INC owned the Holiday Inn from 2007 through November 2014.

17. Defendant BRIGHT HOLIDAY PALMDALE, LLC  d/b/a Holiday Inn, located at 38630 5th Street, West Palmdale, CA 93551 is a for profit limited liability company with its principal place of business in California. It may be served through its registered agent David Wei, 20342 SW Acacia St., Newport Beach, CA 92660, or wherever it may be found. BRIGHT HOLIDAY PALMDALE, LLC owned the Holiday Inn starting in November 2014 and through the rest of Jane Doe (C.M.G.)'s trafficking period.

18. Defendants PALMDALE RESORT, INC and BRIGHT HOLIDAY PALMDALE, LLC will be collectively refered to as "Palmdale Franchisees" or "Franchisee Defendants".

19. Defendant 9901 LA CIENEGA (LOS ANGELES) OWNER, LLC d/b/a Holiday Inn, located at 9901 S. La Cienega Blvd, Los Angeles, CA 90045, is a for profit Limited Liability Company with its principal place of business in Delaware. It owned the Holiday Inn located at 9901 S. La Cienega Blvd, Los Angeles, CA 90045 beginning around 2013. It may be served through its registered agent: PARACORP INCORPORATED, 2140 S Dupont Hwy, Camden, DE 19934, or wherever they may be found.

20. Defendant BRISAM LAX (DE) LLC d/b/a Holiday Inn, located at 9901 S. La Cienega Blvd, Los Angeles, CA 90045 is a for profit limited liability company with its principal place of business in Delaware. It owned the Holiday Inn located at

9901 S. La Cienega Blvd, Los Angeles, CA 90045 beginning in 2007 until October 2013. It may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, or wherever it may be found.

21.    Defendants 9901 LA CIENEGA (LOS ANGELES) OWNER, LLC and BRISAM LAX (DE) LLC will be referred to as "Los Angeles Franchisees" or "Franchisee Defendants."

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

23.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

## STATEMENT OF FACTS

### I.    Jane Doe (C.M.G.) was a Victim of Unlawful Sex Trafficking at Hotels Owned, Operated, Managed and Controlled by Defendants.

24.    Jane Doe (C.M.G.) is a survivor of sex trafficking. Jane Doe (C.M.G.) was trafficked through force and coercion by her trafficker to engage in numerous commercial sex acts.  Jane Doe (C.M.G.) was trafficked continuously from 2003 through December of 2014. Specifically, Jane Doe (C.M.G.) was trafficked from 2010 through December of 2014 the following locations:

a.    TODAY'S V, INC d/b/a Holiday Inn located at 19800 S. Vermont, Torrance, CA 90502; and

b.    PALMDALE RESORT, INC d/b/a Holiday Inn, located at 38630 5th Street, West Palmdale, CA 93551 from 2010 through November 2014;

c.    BRIGHT HOLIDAY PALMDALE, LLC d/b/a Holiday Inn, located at 38630 5th Street, West Palmdale, CA 93551 starting in November 2014;

Jane Doe (C.M.G.) was trafficked from 2008 through December 2014 at the following location:

PLAINTIFF'S ORIGINAL COMPLAINT

    a. 9901 LA CIENEGA (LOS ANGELES) OWNER, LLC d/b/a Holiday Inn, located at 9901 S. La Cienega Blvd, Los Angeles, CA 90045.

    b. BRISAM LAX (DE) LLC d/b/a Holiday Inn, located at 9901 S. La Cienega Blvd, Los Angeles, CA 90045.

25. Jane Doe (C.M.G.)'s trafficking repeatedly occurred in rooms of these Holiday Inn locations and was facilitated by IHG, and Franchisee Defendants. She was repeatedly harbored, maintained, provided, solicited, and forced to engage in commercial sex at the subject locations.

26. Her trafficker controlled her through physical violence and force and made her engage in commercial sex acts for their financial benefit. Her trafficker beat her and left bruises on her body and threatened to kill her if she did not do exactly what he said. Her trafficker forced her to have sex with them and others at their command.

27. Her trafficker posted advertisements of her for commercial sex services online without her consent.

28. She did not want to engage in commercial sex acts but when she tried to leave, her trafficker would severely beat her and threaten her life. Her trafficker engaged in a pattern of control and intimidating and threatening behavior that cause Jane Doe (C.M.G.) to believe she would face serious harm or death if she did not comply with his ongoing demand that she engage in commercial sex for his financial benefit.

29. Jane Doe (C.M.G.) was not allowed to keep any of the money she made.

30. Jane Doe (C.M.G.) was repeatedly trafficked in Defendants' hotels and each Defendant facilitated her trafficking.

31. Jane Doe (C.M.G.)'s trafficking has profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject hotels including effects on Jane Doe (C.M.G.)'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others.

PLAINTIFF'S ORIGINAL COMPLAINT

Observing these effects provided Defendants with notice that Jane Doe (C.M.G.) was being continually subjected to force, coercion, control, and exploitation.

32.    Jane Doe (C.M.G.) remained under the continuous control of her traffickers through at least the end of December 2014.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

33.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at their hotel properties, the subject locations and the trafficking of Jane Doe (C.M.G.).

34.    Sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[4] In 2014, 92 percent of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[4] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

percent of commercial exploitation of children.[6]

35.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[7]

36.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

---

[6] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[7] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission.              End              Human              Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf        (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*,

37.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware of should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals show signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lack freedom of movement or are constantly monitored;

f. Individuals avoid eye contact and interaction with others;

g. Individuals have no control over or possession of money or ID;

h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals have few or no personal items—such as no luggage or other bags;

j. Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k. A group of girls appears to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

---

https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

[9] *See Id.*

10

PLAINTIFF'S ORIGINAL COMPLAINT

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as condoms or lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or use of large amounts of cash or pre-paid cards.[10]

38. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[11]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

39. The relationship between a pimp and a prostitute is inherently coercive, and The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[12] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

40. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but

---

[10] *Id.*

[11] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[12] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

11

PLAINTIFF'S ORIGINAL COMPLAINT

they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[13]

41.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

42.    All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of sex trafficking. Reasonable diligence required Defendants to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

43.    The most effective weapon against sexual exploitation and human trafficking is education and training.[14]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there

---

[13] *Id.*

[14] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

12

PLAINTIFF'S ORIGINAL COMPLAINT

are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[15]

44.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[16]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

45.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

46.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex

---

[15] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023).  *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[16] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

PLAINTIFF'S ORIGINAL COMPLAINT

on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

47.    Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

48.    Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

49.    Unfortunately for Jane Doe (C.M.G.), Defendants' promises have proved empty time and again. While Defendants' statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking. Defendants have made the choice, at all levels, to respond inadequately to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like Jane Doe (C.M.G.).

**III.   Sex Trafficking Has Long Been Prevalent at IHG Branded Properties, and Defendants Have Known About It.**

50.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (C.M.G.)'s trafficking, that sex trafficking was ongoing and widespread at IHG branded properties including the subject properties named herein.

**a. Sex Trafficking at IHG Branded Hotels was well Known by Defendants.**

51.    Use of IHG branded properties, including the subject Holiday Inn locations, for sex trafficking is well known to IHG.

52.    Upon information and belief, each of the Defendants monitored criminal activity occurring at IHG branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe (C.M.G.) was trafficked.

53.    Scores of news stories from across the US highlight IHG's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of IHG hotels for sex trafficking.

54.    Information that has become public through news stories establishes the entrenched and pervasive nature of IHG's role in providing a venue where sex trafficking has continued unabated for years.

- In April 2017, a 16 year old trafficking victim was rescued by police at a Holiday Inn hotel in Elk Grove, California after her Uber driver noticed signs of trafficking as he dropped her off at the hotel and called the police.[17]

- In September 2018, a may was criminally charged after a three month investigation for sex trafficking and was arrested at a Holiday Inn in Plainview, New York.[18]

- In 2014, police arrested several individuals for running a sex trafficking ring out of a Holiday Inn in Allentown, Pennsylvania.[19]

[17] Uber Driver Saves Girl From Sex Slavery, Daily Beast, https://www.thedailybeast.com/uber-driver-saves-girl-from-sex-slavery.

[18] Police: Gang Member Forced Women Into Prostitution, News12 New York, https://bronx.news12.com/police-gang-member-forced-women-into-prostitution-39006797.

[19] Prostitutes From Maryland Worked Out Of Downtown Allentown Hotel, Police Say, Lehigh Valle Live,

- A 2017 analysis by the Houston Chronicle showed that IHG branded hotels were one of the most common locations for prostitution and sex trafficking arrests made by the Houston Police Department.[20]

55.    Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of IHG branded properties.

56.    Based on information and belief, the IHG Defendants managed and monitored on-line reviews of IHG locations. These reviews reflected obvious signs of pervasive sex trafficking and related criminal activity at IHG hotels across the country. For example:

- Regarding a September 2017 stay at a Holiday Inn in Asheville, North Carolina, a customer wrote: "On our fourth day of our anniversary trip an escort or prostitute if you will knocked on my door after midnight asking if we called for services. The hotel claims they do not tolerate this, however the security guard knew immediately who I was referring to as I went to complain…"[21]

- Regarding a July 2012 stay at a Holiday Inn in Las Cruces, New Mexico, a customer wrote: "…before I could get inside the hotel I was asked if I would like to 'party' with some girls. No thanks, but I did call the local police. There are about 5 hotels all nearby & they were making the rounds…"[22]

---

https://www.lehighvalleylive.com/allentown/2014/04/trio_ran_prostitution_business.html.

[20] Houston's Most Popular Hotels For Prostitution Busts, Houston Chronicle, https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php.

[21] Review of Holiday Inn – Asheville, North Carolina (Sep. 28, 2017), available at https://www.tripadvisor.com/ShowUserReviews-g60742-d93926-r528092206-Holiday_Inn_Asheville_Biltmore_West-Asheville_North_Carolina.html.

[22] Review of Holiday Inn Las Cruces, New Mexico (July 15, 2012), available at https://www.tripadvisor.com/ShowUserReviews-g47087-d631385-r134485175-Holiday_Inn_Express_Hotel_Suites_Las_Cruces-Las_Cruces_New_Mexico.html.

16

- Regarding an August 2013 stay at the Holiday Inn in Seattle, Washington, a customer wrote: "…located in the district which seems to specialize in prostitution…"[23]

57.    This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (C.M.G.) was trafficked at the subject properties, the IHG Defendants knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at Holiday Inn branded properties;

b. Sex trafficking was a brand-wide problem for IHG originating from management level decisions at IHG's corporate offices;

c. IHG franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

d. IHG's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

e. IHG and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

58.    Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, IHG chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Holiday Inn locations.**

59.    IHG Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject Holiday Inn locations.

---

[23]Review of Holiday Inn Seattle, Washington (September 3, 2013), available at https://www.tripadvisor.com/ShowUserReviews-g60878-d223217-r175631783-Holiday_Inn_Express_Hotel_Suites_North_Seattle_Shoreline-Seattle_Washington.html

17

60.    Internet reviews for the subject hotels, which upon information and belief Franchisor and Franchisee Defendants managed and monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (C.M.G.) was trafficked. For example:

a. A 2014 Google review for the Los Angeles Holiday Inn states: "Too much drug traffic prostitutes gangs and motorcycle ryders and reco the pimp…"[24]

b. A 2014 TripAdvisor review for the Torrance Holiday Inn states: "Im a crew member with a major airline. I cannot believe that my company would accommodate their front end staff at this property.The Hotel is located in a warehouse district.  The surrounding neighborhood is unsafe.  I suggest that you Pull up a crimes report for the area and you will see numerous assaults and crimes committed in the immediate area…"[25]

c. A 2015 Yelp review for the Los Angeles Holiday Inn states: "…All the crackheads and prostitutes gather here late at night. So, if you can, ask for a room that faces the other side of the hotel."[26]

d. A 2017 Yelp review for the Los Angeles Holiday Inn states: "Awful. Dirty. Bedbugs. Prostitutes. I feared for my safety. Don't stay Here! Holiday inn should be ashamed to be associated with this dump. The neighborhood was sketchy."[27]

e. A 2024 Expedia review of the Palmdale Holiday Inn states: "…There were drug addicts and sex workers entering the hotel at a high enough frequency that we didn't feel safe letting our teenage girls walk around the hotel alone..."[28]

---

[24] https://www.yelp.com/biz/holiday-inn-los-angeles-lax-airport-los-angeles?start=60

[25] https://www.tripadvisor.co.nz/Hotel_Review-g33182-d82353-Reviews-or10-Holiday_Inn_Torrance-Torrance_California.html

[26] https://www.yelp.com/biz/holiday-inn-los-angeles-lax-airport-los-angeles?start=20

[27] https://www.yelp.com/biz/holiday-inn-los-angeles-lax-airport-los-angeles?start=20

[28] https://www.expedia.com/Lancaster-Hotels-Holiday-Inn-Palmdale-Lancaster.h676.Hotel-Information

PLAINTIFF'S ORIGINAL COMPLAINT

61.    Traffickers, including Jane Doe (C.M.G.)'s trafficker, repeatedly chose to use the subject Holiday Inn locations for their sex trafficking activity because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. The traffickers operated with minimal expenditure of time and resources on concealment due to an implicit understanding with the subject hotels that they could operate without risk of disruption. These traffickers followed routine practices and procedures that resulted in obvious signs matching "red flags" that Franchisor and Franchisee Defendants knew and acknowledged to be indicators of sex trafficking in a hotel environment.

62.    Upon information and belief and based on hotel reviews, customer complaints and records of law enforcement calls, there were multiple trafficking victims exploited at the subject Holiday Inn locations named herein prior to Jane Doe (C.M.G.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

63.    All knowledge from the staff at these subject Holiday Inn locations is imputed to their respective Franchisee Defendants. Franchisee Defendants knew about this widespread and ongoing trafficking at their respective Holiday Inn locations, including the trafficking of Jane Doe (C.M.G.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to

Franchisor Defendants based on the existence of an agency relationship as described below.

64.     Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, the IHG Brand Defendants and Franchisee Defendants learned or should have learned about the obvious signs of widespread trafficking at their subject Holiday Inn locations, based on non-public sources of information including but not limited to:

         a.  Surveillance of the property;

         b.  Internal investigations;

         c.  Customer complaints;

         d.  Monitoring of customer feedback;

         e.  Information received from law enforcement;

         f.  And other sources of non-public information available to Franchisees.

65.     Upon information and belief, Franchisor Defendants knew or should have known about the widespread trafficking at the subject Holiday Inn locations referenced herein, based on:

         a.  The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Franchisor Defendants;

         b.  The IHG Brand Defendants' regular monitoring of online reviews;

         c.  The IHG Brand Defendants' collection and monitoring of customer surveys and complaints;

         d.  The IHG Brand Defendants' requirement that franchisees submit regular and detailed reports to their IHG Brand Defendants about day-to-day hotel operations;

         e.  The IHG Brand Defendants' regular inspections of the hotel property;

20

PLAINTIFF'S ORIGINAL COMPLAINT

f.  IHG Brand Defendants' use of field agents who worked directly with the subject locations, including through on-site work on security issues;

g.  IHG Brand Defendants' collection and monitoring of data about guests at the subject locations, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

h.  IHG Brand Defendants' supervision and control over day-to-day operations of the subject locations through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisees to use and through which franchisees were obligated to allow Franchisor Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

i.  IHG Brand Defendants' access to surveillance and security systems;

j.  Information provided to IHG Brand Defendants by law enforcement; and

k.  Other sources of information available to Defendants.

66.    Upon information and belief, under the Franchisor Defendants' protocols, which on their face required hotel staff and management and Franchisee Defendants to report suspected criminal activity to their Franchisor Defendants, hotel staff and management and Franchisee Defendants were required to report instances of suspected sex trafficking to their Franchisor Defendants prior to Jane Doe (C.M.G.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Holiday Inn locations.

67.    Upon Information and belief, the IHG Brand Defendants observed obvious "red flags" of numerous instances of sext trafficking occurring at their subject Holiday Inn locations based on their supervision and monitoring of the property.

21

**a. Defendants knew Jane Doe (C.M.G.) was being trafficked at these subject Holiday Inn locations because of the apparent and obvious "red flags" of sex trafficking.**

68.     During the period that Jane Doe (C.M.G.) was trafficked at the subject Holiday Inn locations named herein, there were obvious signs that her trafficker was engaged in sex trafficking that occurred at each location:

    a.  The hotel rooms in which she was trafficked were paid for with cash;

    b.  Jane Doe (C.M.G.) used her ID or her trafficker's ID to rent the rooms and would stay for a week or multiple weeks in a row. Jane Doe (C.M.G.) would rent two rooms at a time.

    c.  Other girls were trafficked at the same hotel at the same time as Jane Doe (C.M.G.);

    d.  Even though Jane Doe (C.M.G.) and her trafficker would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

    e.  Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services. Jane Doe (C.M.G.) would place the towels outside the door and constantly ask for fresh towels and sheets;

    f.  The trafficker would linger around the hotel or in the parking lot while Jane Doe (C.M.G.) was with a john;

    g.  There was heavy foot traffic in and out of Jane Doe (C.M.G.)'s room involving men who were not hotel guests;

    h.  Jane Doe (C.M.G.) had multiple johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

    i.  Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

69.     Multiple employees at the subject Holiday Inn locations named herein, including management-level employees, observed, or were made aware of these

obvious signs of trafficking while acting within the scope and course of their employment.

70.    As such, Franchisee Defendants knew or was willfully blind to the fact that Jane Doe (C.M.G.) was being trafficked at the subject Holiday Inn properties.

71.    Given these obvious signs, IHG knew or should have known about the trafficking of Jane Doe (C.M.G.) based on their policies or protocols that required hotel staff and Franchisee Defendants to report suspected criminal activity including sex trafficking.

72.    The Franchisor Defendants and Franchisee Defendants had constructive knowledge of the trafficking of Jane Doe (C.M.G.) at the Subject Holiday Inn locations because Jane Doe's trafficking was the direct result of the Franchisor Defendants and Franchisee Defendants facilitating trafficking at their Subject Holiday Inn locations.

73.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at IHG branded hotels, and at their Holiday Inn locations, Franchisor Defendants and Franchisees each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at their Subject hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If the Defendants had used reasonable prudence, they would have been aware of Jane Doe (C.M.G.)'s trafficking at the Subject Holiday Inn locations and that they were benefiting from such trafficking.

**IV.    Defendants actively facilitated sex trafficking at these subject Holiday Inn locations, including the trafficking of Jane Doe (C.M.G.).**

74.    Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (C.M.G.) at the Subject Holiday Inn locations because the trafficking was a direct result of Defendants facilitating her trafficking at the properties.

**a. Franchisee Defendants facilitated the trafficking activity at their Subject Holiday Inn locations, including the trafficking of Jane Doe (C.M.G.).**

75. Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of their respective Holiday Inn locations when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of their employees given the specific risks, known to Franchisee Defendants, of sex trafficking occurring at their respective Holiday Inn location.

76. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at their subject Holiday Inn locations, Franchisee Defendants continued renting rooms to these traffickers, including Jane Doe (C.M.G.)'s trafficker and including the rooms used to sexually exploit Jane Doe (C.M.G).

77. Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (C.M.G.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.M.G.)'s sexual exploitation.

78. Franchisee Defendants also facilitated the harboring, providing, maintenance, and exploitation of Jane Doe (C.M.G.) and other victims at their subject hotel when it continued to provide rooms where they were imprisoned and exploited, despite actual knowledge of or willful blindness to the fact that these victims were being trafficked at their subject location.

79. Franchisee Defendants also facilitated widespread trafficking at their respective Holiday Inn location, including the trafficking of Jane Doe (C.M.G.), in ways including:

    a. Failing to adequately enforce policies, procedures and practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

24

b. Continuing to provide services and assistance to traffickers after observing obvious "red flags" of sex trafficking;

c. Following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site; and

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

80. Franchisee Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

81. Policies purportedly enacted and enforced by Franchisors to identify signs of sex trafficking and stop it from occurring were not properly implemented at their Subject Holiday Inn locations by either Franchisor Defendants or Franchisee Defendants. Jane Doe (C.M.G.)'s  trafficker was able to continue the trafficking venture at the Subject Holiday Inn locations. Had Franchisor Defendants enforced their policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above,  Jane Doe (C.M.G.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Holiday Inn locations. Furthermore, had Franchisee Defendants properly followed the franchise policies enacted by their Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (C.M.G.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Holiday Inn locations.

**b. The IHG Brand Defendants facilitated the trafficking activity at the Subject Holiday Inn locations, including the trafficking of Jane Doe (C.M.G.).**

25

PLAINTIFF'S ORIGINAL COMPLAINT

82.    Franchisor Defendants participated directly in aspects of the operation of the subject Holiday Inn properties that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (C.M.G.), as follows:

a. Assuming joint responsibility with their franchisees for detecting and preventing human trafficking at the hotel property;

b. Assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to their franchisor;

c. Assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. Assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. Employing field-based associates who work with hotels on trafficking issues;

f. Assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place

g. Establishing systems for guests to report security issues to their franchisor;

h. Requiring their franchisees to provide Wi-Fi/internet access to guests;

i. Mandating the specific tools and systems that their franchisees must use to provide Wi-Fi/internet access to guests;

j. Setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage

k. Requiring their franchisees to use a system to monitor and track housekeeping requests; and

l. Setting policies for when and how housekeeping services are provided;

PLAINTIFF'S ORIGINAL COMPLAINT

m. Collecting and monitoring data that shows patterns of use of housekeeping services;

n. Setting policies for when and how hotel staff can accept tips.

83.    IHG Brand Defendants directly participated in and retained day-to-day control over renting rooms at the subject Holiday Inn locations by, among other things:

a. Controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. Reserving rooms and accept payments without requiring franchisees approval or involvement;

c. Controlling and restricting the ability of franchisees and staff to refuse or cancel a reservation;

d. Requiring the franchisees to use a software system operated and controlled by their franchisor for booking rooms and checking guests into rooms;

e. Requiring their franchisee to use a software system operated and controlled by the franchisor to process payments;

f. Controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification;

g. Requiring their franchisee to use a property-management system operated and controlled by the franchisor;

h. Requiring their franchisee to use a data-management system operated and controlled by the franchisor;

i. Ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

j. Exercising control over the price of rooms;

k. Controlling all details of the customer loyalty program that the franchisee was required to implement;

PLAINTIFF'S ORIGINAL COMPLAINT

l.  Setting detailed policies for the check-in process, including requirements for identification and payment methods;

m. Collecting guest data, requiring their franchisee to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

n.  Assuming sole ownership over all guest information;

o.  Overseeing do not rent (DNR) lists for its branded properties.

84.     The IHG Brand Defendants had a direct business relationship with traffickers operating at the subject Holiday Inn locations because, among other things, the IHG Brand Defendants directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Franchisor Defendants by developing brand loyalty and intentionally choosing IHG hotels because it was known they created a favorable environment for trafficking.

85.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Holiday Inn locations named herein, Franchisor Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (C.M.G.).

86.     Franchisor Defendants knew or should have known that Jane Doe (C.M.G.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them motel rooms and related services to facilitate Jane Doe (C.M.G.)'s sexual exploitation.

87.     Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Holiday Inn locations, the Franchisor Defendants continued participating in a venture at these hotels, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a. Adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b. Adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c. Adopting and enforcing training methods for the franchisees and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. Adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e. Providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f. Adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisees and hotel staff related to human trafficking at subject Hyatt and Holiday Inn locations;

g. Implicitly or explicitly encouraging franchisees to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking;

88. If Franchisor Defendants had exercised reasonable diligence when operating the Subject Holiday Inn properties and in the areas where it retained control, Franchisor Defendants would have prevented the subject Holiday Inn locations from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.M.G.). Instead, Franchisor Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.M.G.).

PLAINTIFF'S ORIGINAL COMPLAINT

89.    The IHG Brand Defendants should have known about Jane Doe (C.M.G.)'s trafficking because it retained control over the training of the staff of the subject Holiday Inn locations regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the IHG Brand Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of Jane Doe (C.M.G.) at the Subject Holiday Inn locations. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the IHG Brand Defendants.

90.    The IHG Brand Defendants should have known about Jane Doe (C.M.G.)'s trafficking because they also retained control over the response of their IHG hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the IHG Brand Defendants facilitated sex trafficking, including the sex trafficking of Jane Doe (C.M.G.) in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the IHG Brand Defendants.

91.    The IHG Brand Defendants also should have known about Jane Doe (C.M.G.)'s  trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including the Subject Holiday Inn locations, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Subject Holiday Inn locations. The IHG Brand Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including Jane Doe (C.M.G.). Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the IHG Brand Defendants.

92.     The IHG Brand Defendants also should have known about Jane Doe (C.M.G.)'s trafficking because they retained control over the security of the Subject Holiday Inn locations through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting their Subject hotels. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the IHG Brand Defendants had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the IHG Brand Defendants.

93.     Jane Doe (C.M.G.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the IHG Brand Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

94.     Moreover, Jane Doe (C.M.G.)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to their Subject Hyatt and Holiday Inn locations over an extended period because the IHG Brand Defendants adopted policies and practices that insulated Jane Doe (C.M.G.)'s trafficker from significant risk of detection or disruption.

**V.     Defendants' ventures at the Holiday Inn properties.**

95.     Franchisor defendants generated substantial income from the subject Holiday Inn locations. The fees generated by the IHG Brand Defendants were primarily based on gross room rentals; therefore, the IHG Brand Defendants' profits increased with each room rental at their Subject Holiday Inn locations, including each room rented to a trafficker. Revenue generated from rooms rented at their Subject Holiday Inn locations was distributed among the IHG Brand Defendants, with each benefiting from each rental of a hotel room to a trafficker, including Jane Doe (C.M.G.)'s trafficker.

96. Franchisee Defendants profited from every room rented to a trafficker or for use in trafficking at their respective Holiday Inn location, both from the room fee and from fees for other hotel services.

97. In ways described more fully above, the IHG Brand Defendants and Franchisee Defendants knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the population of sex traffickers operating out of their respective Holiday Inn location including Jane Doe (C.M.G.)'s trafficker. (hereinafter "**Venture 1**").

98. The IHG Brand Defendants and Franchisee Defendants formed this continuous business relationship and implicit understanding with the traffickers at their Subject Holiday Inn location by continuing to rent rooms to be used for trafficking (including C.M.G.'s trafficking) after the IHG Brand Defendants and Franchisee Defendants knew or should have known that the rooms were being used for unlawful trafficking.

99. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Hyatt and IHG Brand Defendants and Franchisees were generating revenue by renting the hotel rooms.

100. The implicit understanding developed because sex traffickers, including Jane Doe (C.M.G.)'s, frequently used the Subject Holiday Inn locations for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the IHG Brand Defendants and Franchisee Defendants that created a favorable environment for sex trafficking to flourish.

101. Both the IHG Brand Defendants and their Franchisees participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisee Defendants provided "boots on the ground" at the hotel, and the IHG Brand Defendants played a primary role in renting rooms at the

PLAINTIFF'S ORIGINAL COMPLAINT

Subject Holiday Inn locations and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

102. The IHG Brand Defendants and Franchisee Defendants participated in the venture by continually renting rooms to traffickers, including Jane Doe (C.M.G.)'s, after they knew or should have known that victims like Jane Doe (C.M.G.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Subject Holiday Inn locations as a venue for their illegal activities.

103. IHG Brand Defendants and their Franchisee Defendants did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

    a. The population of traffickers, including (C.M.G.)'s, were familiar to the staff at the Subject Holiday Inn locations;

    b. These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject Holiday Inn locations but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

    c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

    d. Defendants provided additional services to traffickers (including (C.M.G.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms

    e. The staff designated an area of the hotel, in the back of a hallway but near an unlocked door, for traffickers, which facilitated their illegal activities

PLAINTIFF'S ORIGINAL COMPLAINT

104. The criminal traffickers operating at the Subject Holiday Inn locations as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (C.M.G.).

105. If IHG Brand Defendants and Franchisee Defendants had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from Jane Doe (C.M.G.)'s trafficking at their Subject Holiday Inn locations.

106. In ways described more fully above, the IHG Brand Defendants and Franchisee Defendants also knowingly received a financial benefit from participating in a commercial hotel-operating venture at their Subject Holiday Inn locations (hereinafter "**Venture 2**").

107. The IHG Brand Defendants and their Franchisee Defendants had a longstanding business relationship pursuant to which they jointly participated in operation of their respective Holiday Inn location with a shared goal of maximizing revenue, including gross room revenue.

108. They IHG Brand Defendants and their Franchisee Defendants, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at their Subject Holiday Inn locations by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at these hotels.

109. Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Subject Holiday Inn locations, which resulted in Jane Doe (C.M.G.) and other victims being harbored, maintained, and provided in the rooms of the Subject Holiday Inn locations. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisee Defendants who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C. § 1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C. § 1591(a)(2).

110.   Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the IHG Brand Defendants and their Franchisees participated in the venture by continuing to operate their Subject Holiday Inn locations in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (C.M.G.). The IHG Brand Defendants provided their Franchisees with operational support, use of trademarks, marketing services, and other resources to operate their Subject Holiday Inn locations in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI.    Franchisee Defendants and the Staff at the Holiday Inn Locations Named Herein Acted as Actual Agents of IHG Defendants.

111.   IHG Defendants are vicariously liable for the acts, omissions, and knowledge of their Franchisee Defendants and staff at their respective Holiday Inn locations named herein, which are IHG's actual agents or subagents.

112.   The IHG Defendants subjected Franchisee Defendants to detailed standards and requirements regarding the operation of their respective Holiday Inn locations named herein through their franchising agreements, through detailed written policies and manuals, and expectations imposed by the IHG Brand Defendants as they oversaw and supervised hotel operations.

113.   The IHG Franchisor Defendants obscure the full extent of control they exercise over their Franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Franchisor Defendants imposed on their Franchisees:

   a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used at their respective Holiday Inn locations;

   b. Covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, décor, equipment,

PLAINTIFF'S ORIGINAL COMPLAINT

vehicles, supplies, foodstuffs, printed matters, and internal operating functions;

c. Dictated the specific manner in which Franchisee Defendants and their respective hotel staff must carry out most day-to-day functions at their subject Holiday Inn locations; and

d. Significantly exceeded what was necessary for IHG to protect its registered trademarks.

114. In addition to the ways described above, upon information and belief, IHG exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of their respective Holiday Inn locations named herein, including the following ways:

a. The Franchisor Defendants required their franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Franchisor Defendants to protect their registered trademarks;

b. The IHG Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels. IHG Brand Defendants provided training for hotel management and select hotel staff on-site and at locations selected by Franchisors;

c. The IHG Brand Defendants provided their hotels staff with training and controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d. The IHG Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The IHG Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. The IHG Brand Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

PLAINTIFF'S ORIGINAL COMPLAINT

g. The IHG Brand Defendants required their franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h. For certain products and services that franchisees were required to purchase to operate the property, IHG Brand Defendants designated approved vendors and prohibited their franchisees from purchasing goods and services from anyone other than an approved vendor;

i. The IHG Brand Defendants required their franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j. The IHG Brand Defendants set required staffing levels for the subject properties;

k. The IHG Brand Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l. The IHG Brand Defendants set requirements for the hiring process used by their franchisees and oversaw employee discipline processes and termination decisions;

m. The IHG Brand Defendants provided benefits for employees of franchised hotels;

n. The IHG Brand Defendants controlled channels for guests to report complaints or provide feedback regarding their subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. IHG retained the right to provide refunds or other compensation to guests and to require Franchisee Defendants to pay associated costs;

o. The IHG Brand Defendants generated reports and analysis of guest complaints and online reviews for their subject properties;

p. The IHG Brand Defendants set detailed requirements for insurance that Franchisee Defendants must purchase;

q. The IHG Brand Defendants exercised or retained control over their franchisees' day-to-day accounting and banking practices;

37

PLAINTIFF'S ORIGINAL COMPLAINT

r.  The IHG Brand Defendants regularly audited the books and records of the Franchisee Defendants;

s.  The IHG Brand Defendants conducted frequent and unscheduled inspections of their subject properties;

t.  The IHG Brand Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if their franchisees violated any of IHG's detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of their subject properties;

u.  The IHG Brand Defendants controlled all marketing for their subject properties, directly provided marketing services, and prohibited Franchisee Defendants from maintaining any online presence unless specifically reviewed and approved by IHG Defendants;

v.  The IHG Brand Defendants exercised or retained control over all aspects of building and facility design;

w.  The IHG Brand Defendants imposed detailed recordkeeping and reporting requirements on their Franchisee Defendants regarding virtually all aspects of hotel operations. The Franchisor Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

x.  IHG Brand Defendants supervised and controlled day-to-day operations of their subject properties through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendants to use;

y.  IHG Brand Defendants required their franchisees and hotel staff to implement a data system that gives Franchisors real-time information that it can monitor on a day-to-day basis; and

z.  IHG Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations

115.  Upon information and belief, IHG Brand Defendants had the right to and did enforce its control over Franchisee Defendants through various methods, including:

38

PLAINTIFF'S ORIGINAL COMPLAINT

a. The right to conduct detailed inspections of the subject properties;

b. Monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;

c. Directing Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. Mandating training and education for franchisees and/or hotel staff;

e. Employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. The right to impose fines or penalties

g. The right to impose additional conditions on franchisees or to restrict or limit its rights to provide goods and services; and

h. The right to terminate the franchise agreements for failure to comply with policies that govern the means and methods used for day-to-day operations.

116. The IHG Brand Defendants are also vicariously liable for Franchisees and the hotel staff because it retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (C.M.G.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. IHG Brand Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

///

## VII. The Franchisor Brand Defendants are jointly responsible for the trafficking of Jane Doe (C.M.G.).

117. All the IHG Brand Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights

PLAINTIFF'S ORIGINAL COMPLAINT

of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

118.   Upon information and belief, operation of the subject Holiday Inn locations were part of a single unified operation by the IHG Brand Defendants. Upon information and belief, all IHG Defendants share a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, the IHG Brand Defendants acted jointly to own, operate, control, manage, and supervise their subject Holiday Inn locations. As an integrated enterprise and/or joint venture, the IHG Brand Defendants were separately and jointly responsible for compliance with all applicable laws.

## VIII. Defendants are Jointly and Severally Liable for Jane Doe (C.M.G.)'s Damages.

119.   The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (C.M.G.).

120.   Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (C.M.G.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

121.   Jane Doe (C.M.G.)  incorporates all previous allegations.

## I.   Count 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a).

122.   Jane Doe Jane Doe (C.M.G.) is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

123.   Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including C.M.G.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property.

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel property.

124. Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (C.M.G.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

## II.    Count 2: Beneficiary Liability under §1595 (a) of the TVPRA (All Defendants).

125.   Jane Doe (C.M.G.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

126.   All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendants knew or should have known was engaged in a violation of the TVPRA.

127.   **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating a venture with sex traffickers, including C.M.G.'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

a. Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Subject Holiday Inn locations by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Subject Holiday Inn locations to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of (C.M.G.).

b. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including (C.M.G.), in the rooms of the Subject Holiday Inn locations.

c. Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

d. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including C.M.G.'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including C.M.G.'s). Each Defendant received a financial benefit every time a trafficker rented a room.

e. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including C.M.G.'s trafficking).

128. **Venture 2:** Through acts and omissions more fully described throughout this Complaint, the Franchisor Defendants received a financial benefit from participating in Venture 2 with Franchisee Defendants operating their Subject Holiday Inn locations. Each of the Franchisor Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a. Venture 2 is a commercial venture that resulted from the business relationship between each Franchisor Defendants during its respective time as franchisor for the Subject Holiday Inn locations and their respective Franchisees to operate their Subject hotels with a common objective of maximizing revenue at the hotels, including gross room revenue.

PLAINTIFF'S ORIGINAL COMPLAINT

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Subject Holiday Inn locations, including the trafficking of (C.M.G.).

c. Each Franchisor Defendant, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. Each Franchisor Defendant knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Subject Holiday Inn locations, which increased every time a room was rented including rooms rented to traffickers.

e. Each Franchisor Defendant, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with Franchisees despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

129. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (C.M.G.).

**III. Count 3: Vicarious Liability for TVPRA Violations (Franchisor Defendants).**

130. Franchisee Defendants acted as the actual agent of its Franchisor Defendants when operating its respective hotel property. The agency relationship between the Franchisees and their Franchisor lasted for the period during which their Franchisors were involved in operation of their respective hotels through its role as franchisor.

131. Through the acts and omissions described throughout this Complaint, Franchisor Defendants, at the relevant time, exercised or retained the right to exercise

systematic and day-to-day control over the means and methods used by its Franchisee Defendants to operate its respective hotel property, the specific aspects of operations that caused Jane Doe (C.M.G.)'s harm as described above.

132.   Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

133.   As a result of the relationship between Franchisee and Franchisors, Franchisors are vicariously liable for the acts of Franchisee, including at the Subject Holiday Inn locations. Factors that support this allegation are that Franchisors shared profits, standardized employee training, standardized and strict rules of operations. Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Franchisors had the right to terminate any franchisee that failed to comply with the requirements promulgated by Franchisors. Thus, Franchisors retained control, or the right to control, the mode and manner of work contracted for.

134.   As alleged above, Franchisor Defendants are directly liable to Jane Doe (C.M.G.) for violations of the TVPRA as a beneficiary under 18 U.S.C §1595(a). Franchisee Defendants are also directly liable to Jane Doe (C.M.G.) under § 2255. Franchisor Defendants are vicariously liable to Jane Doe (C.M.G.) for those same violations.

135.   Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject Holiday Inn locations, enabled and contributed to the sex trafficking of Jane Doe (C.M.G.).

## DISCOVERY RULE

136.   To the extent Defendants assert an affirmative defense of limitations, Jane Doe (C.M.G.) invokes the discovery rule. At the time Jane Doe (C.M.G.) was harmed, Jane Doe (C.M.G.) did not know that she was the victim of human trafficking, that her

injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, and certainly not more than ten years before suit was filed. Moreover, at the time the trafficking occurred, Jane Doe (C.M.G.) did not know what "human trafficking" was, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the existence of a cause of action until shortly before suit was filed, and certainly not more than ten years before suit was filed.

## DAMAGES

137. Defendants' acts and omissions, individually and collectively, caused Jane Doe (C.M.G.) to sustain legal damages.

138. Franchisor and Franchisee Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (C.M.G.).

139. Jane Doe (C.M.G.) is entitled to be compensated for personal injuries and economic damages, including:

    a. Actual damages (until trial and in the future);

    b. Incidental and consequential damages (until trial and in the future);

    c. Mental anguish and emotional distress damages (until trial and in the future);

    d. Lost earnings and lost earning capacity (until trial and in the future);

    e. Necessary medical expenses (until trial and in the future);

    f. Life care expenses (until trial and in the future);

    g. Physical pain and suffering (until trial and in the future);

    h. Physical impairment (until trial and in the future);

    i. Exemplary/Punitive damages;

    j. Attorneys' fees;

    k. Costs of this action; and

l.  Pre-judgment and all other interest recoverable.

## JURY TRIAL

140.  Jane Doe (C.M.G.) demands a jury trial on all issues.

## RELIEF SOUGHT

141.  WHEREFORE, Jane Doe (C.M.G.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (C.M.G.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (C.M.G.) may, in law or in equity, show herself to be justly entitled.

DATED:  December 30, 2024          Respectfully submittted,

By:  _____ /s/ Amanda J.G. Walbrun _____
AMANDA J.G. WALBRUN
BOUCHER LLP
21600 W Oxnard Street
Suite 600
Woodland Hills, CA 91367
(818) 340-5400
(818) 340-5401 Facsimile
walbrun@boucher.la

46

PLAINTIFF'S ORIGINAL COMPLAINT

ANNIE MCADAMS PC
Annie McAdams, pro hac vice pending
2900 North Loop West
Suite 1130
Houston, Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
annie@mcadamspc.com

SICO HOELSCHER HARRIS, LLP
David E. Harris, pro hac vice pending
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
dharris@shhlaw.com

***Attorneys for Plaintiff***

PLAINTIFF'S ORIGINAL COMPLAINT

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Jane Doe (C.M.G.) hereby demands a jury trial on all issues so triable.

DATED: December 30, 2024      Respectfully submittted,

             By:       /s/ Amanda J.G. Walbrun
                  AMANDA J.G. WALBRUN
                  BOUCHER LLP
                  21600 W Oxnard Street
                  Suite 600
                  Woodland Hills, CA 91367
                  (818) 340-5400
                  (818) 340-5401 Facsimile
                  walbrun@boucher.la

                  ANNIE MCADAMS PC
                  Annie McAdams, pro hac vice pending
                  2900 North Loop West
                  Suite 1130
                  Houston, Texas 77092
                  (713) 785-6262
                  (866) 713-6141 Facsimile
                  annie@mcadamspc.com

                  SICO HOELSCHER HARRIS, LLP
                  David E. Harris, pro hac vice pending
                  819 N. Upper Broadway
                  Corpus Christi, Texas 78401
                  (361) 653-3300
                  (361) 653-3333 Facsimile
                  dharris@shhlaw.com

                  ***Attorneys for Plaintiff***

48

PLAINTIFF'S ORIGINAL COMPLAINT